IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 6, 2001 Session

## STATE OF TENNESSEE v. STEVEN LEE WHITEHEAD

**Direct Appeal from the Circuit Court for Madison County**
**No. 99-152     Roy B. Morgan, Judge**

---

**No. W2000-01062-CCA-R3-CD - Filed September 7, 2001**

---

The appellant, Steven Lee Whitehead, was convicted by a jury in the Madison County Circuit Court of three counts of rape. Pursuant to the appellant's convictions, the trial court imposed concurrent sentences of ten years incarceration in the Tennessee Department of Correction. On appeal, the appellant presents the following issues for our review: (1) whether the trial court erred in excluding at the appellant's trial evidence of other sexual behavior by the victim; (2) whether the trial court erred in excluding evidence of prior false testimony by the victim; (3) whether the trial court erred in failing to either exclude DNA evidence or, in the alternative, grant the appellant a continuance of the trial date; (4) whether the trial court erred in excluding evidence concerning the appellant's character; (5) whether the evidence adduced at trial is sufficient to support the appellant's convictions of rape; and (6) whether the trial court erred in failing to instruct the jury on sexual battery as a lesser-included offense of each count of rape. Following a thorough review of the record and the parties' briefs, we reverse the judgments of the trial court due to the court's failure to instruct the jury on sexual battery, and we remand these cases for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Reversed and Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and DAVID H. WELLES, J., joined.

Sam J. Watridge, Humboldt, Tennessee, for the appellant, Steven Lee Whitehead.

Paul G. Summers, Attorney General and Reporter; Kim R. Helper, Assistant Attorney General; Jerry Woodall, District Attorney General; and Jody Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

On March 16, 1999, a Madison County Grand Jury returned an indictment charging the appellant with three counts of raping RB, the fifteen-year-old friend of his daughter Catie.[1] The indictment arose from RB's allegation that the appellant sexually assaulted her during the late evening hours of September 19, 1998, and the early morning hours of September 20, while she was spending the night with Catie at the appellant's apartment in Jackson, Tennessee. The appellant's case proceeded to trial on January 26, 2000.

At trial, RB testified that, on the night of the appellant's offenses, she and Catie were watching movies with the appellant in the living room of his apartment, and she fell asleep. When she awakened, RB noticed that both Catie and the appellant had likewise fallen asleep, and the movie had ended. RB, who is an insulin-dependent diabetic, then decided to give herself an insulin injection. Accordingly, she retrieved her syringes from her overnight bag and went to the kitchen where she had previously placed her insulin in the refrigerator. RB's activity in the kitchen awakened the appellant, who turned off the television and the videocassette recorder and inquired if RB was ready to go to bed. RB responded affirmatively; at the time, she was already dressed in preparation for bed, wearing underwear, boxer shorts, and a shirt that the appellant had loaned to her.

RB accompanied the appellant to the bedroom in which she was to sleep with Catie. The appellant removed clothing from the bed and then indicated that he was going to carry his sleeping daughter from the living room into the bedroom. Instead, however, the appellant merely went into the hallway and turned off a light before returning to the bedroom. RB recalled, "He was trying to joke around, laughing, and he kind of jumped on the bed in a wrestling kind of way." She testified that the appellant's behavior "made [her] a little uncomfortable," and, therefore, she asked the appellant to go to the living room and get Catie. At this point, the appellant began kissing RB and "rubbing" her "[o]n the chest and down towards [her] pants." RB told the appellant to stop and attempted to pull the appellant's hands away from her. Nevertheless, he succeeded in rubbing her vagina and inserting his finger into her vagina. When RB repeated her request that the appellant get Catie from the living room, the appellant merely responded, "It'll be all right. Just hold on a second."

The appellant next positioned RB on her back and attempted to pull her boxer shorts down her legs. RB "grabbed" her boxer shorts and once again asked the appellant to get his daughter. RB recalled, "He kept pulling my boxers down, and I kept trying to pull them up, but he held my hands and pulled them down." The appellant also removed RB's underwear and performed cunnilingus upon her, penetrating RB's vagina with his tongue. RB recounted to the jury, "I was crying and told him to stop, to go get Catie, and since I didn't have my hands, I smashed his head with my legs, and that didn't bother him." She explained to the jury that she did not scream because she was afraid and because she did not want Catie to see what was happening.

---

[1] It is the policy of this court to withhold the identity of minor victims of sexual offenses, referring to them only by their initials.

Following cunnilingus, the appellant continued to hold RB's hands down and removed his own shorts. He then engaged in sexual intercourse with RB, penetrating her vagina with his penis. Only after ejaculating on RB's stomach did the appellant finally leave the bedroom. RB immediately ran to the bathroom where she cleaned her stomach and wiped herself between her legs with her underwear. RB conceded at trial that, although she was sore following the appellant's assault, she did not suffer any bruises.

The appellant soon returned to the bedroom carrying Catie and placed his daughter on the bed. When the appellant left the bedroom once again, RB began crying and threw an alarm clock against the wall, awakening Catie. The noise also caused the appellant to briefly check on the two girls. He inquired if RB was having a bad dream and kissed her on the forehead before leaving the bedroom a final time.

The following morning, RB awakened at approximately 9:30 a.m. or 10:00 a.m. She bathed before dressing and returning home. At home, RB did not immediately confide to her parents that she had been raped. Instead, she first spoke with her boyfriend, Hunter Jones. Only later that night did she finally disclose to her mother the appellant's offenses. Her mother then drove her to a local hospital.

RB's mother also testified on behalf of the State at the appellant's trial. She confirmed that, in September 1998, she took her daughter to the Jackson-Madison County General Hospital. She explained:

> My daughter came to me in tears after she had tried to - - She didn't try to slash her wrists to kill herself, but self-mutilation was involved, and it terrified me, and when - - in questioning her, she finally broke down and stated to me that she had been raped, and we went [to the hospital] because of the rape situation.

RB gave her mother the boxer shorts and the underwear that she had worn during the rapes, and her mother in turn gave the items to the Jackson Police Department.

Stacey Hutchens, a sergeant with the Jackson Police Department, testified at trial that he was the lead investigator in the appellant's case and interviewed RB on the night of September 20, 1998. Hutchens described RB's demeanor:

> She was very upset. Of course, she had to tell what happened. She already had told it to one officer and I think a nurse out there, and, of course, I had to hear it again. So, I mean, it was hard for her to go through it that third time again, just to relive it.

Hutchens also interviewed the appellant, who denied engaging in any form of sexual activity with RB. Moreover, the appellant refused to provide a blood sample to investigators, and Hutchens was forced to procure a search warrant in order to obtain the sample.

The State also presented the testimony of Steven M. Wiechman. Wiechman testified that, at the time of these offenses, he was employed as a special agent forensic scientist by the

-3-

Tennessee Bureau of Investigation (TBI) and worked in the Serology and DNA Unit of the TBI Crime Laboratory in Jackson, Tennessee. He examined the underwear worn by RB at the time of these offenses and confirmed the presence of spermatozoa and sperm. However, vaginal swabs obtained from the victim contained no evidence of seminal fluid.

Chad Johnson, another special agent forensic scientist working in the Serology and DNA Unit of the TBI Crime Laboratory in Jackson, related to the jury that he conducted polymerase chain reaction (PCR) DNA analysis on a "cutting" from underwear retrieved from RB and on blood samples submitted by RB and the appellant. The cutting yielded a mixture of DNA profiles "consistent with both the victim and the subject, and, therefore, the subject couldn't be excluded as the donor of that stain." After completing his analysis, Johnson transported a "cutting" from RB's underwear and blood samples submitted by RB and the appellant to the TBI Crime Laboratory in Nashville for further testing.

Raymond A. DePriest, a special agent forensic scientist working in the Serology and DNA Unit of the TBI Crime Laboratory in Nashville, testified on behalf of the State that he too performed PCR DNA testing on a cutting of the underwear obtained from RB and blood samples submitted by RB and the appellant. In contrast to Special Agent Johnson, DePriest used a form of PCR DNA testing known as "STR." DePriest explained that "STRs are the next step forward into DNA profiling. They supply much more defining information. They give DNA a much greater sense of uniqueness and identity when individualizing or trying to understand could a stain have originated from an individual or not." Using the "STR" method, DePriest found that the DNA profile extracted from RB's underwear matched the DNA profile extracted from the appellant's blood sample. Moreover, DePriest calculated that, within the Caucasian population, the probability that someone other than the appellant contributed the DNA found on the underwear was one in 658 billion; within the black population, the probability was one in 215 trillion. He noted, however, that the TBI officially does not report values larger than the world population. Accordingly, he concluded that the probability that someone other than the appellant contributed the DNA found on RB's underwear was one in six billion.

As to the means by which he calculated the above probabilities, DePriest testified that he used a data base of DNA samples provided by the Perken-Elmer Corporation. He explained:

Many of the crime labs across the United States are using the Perken[-]Elmer database. We take their values, place them into the FBI's software and actually use the software or the mathematics that the FBI has put forward that's been accepted nationally to generate statistical values or our final numbers that we use.

The special agent conceded that he was unaware of the geographical source of the DNA samples contained in the data base. He noted, however, that the data base used by the TBI had been compared with data bases used in other laboratories in the United States and had satisfied requisite standards.

In defense, the appellant declined to testify on his own behalf. However, he did

present the testimony of his daughter, Catie Whitehead. She testified that, prior to the appellant's offenses, she and RB were very good friends. Moreover, she confirmed that, on the night of the appellant's offenses, she and RB were staying at her father's apartment. While watching a movie with RB and her father, Catie fell asleep. She was awakened at approximately 2:30 a.m. by the appellant, who carried her to the bedroom that she was sharing with RB. When Catie entered the bedroom, RB was already in bed, but Catie noticed that her friend was crying. RB buried her head in her pillows in an apparent attempt to hide her tears, and, when Catie inquired if anything was wrong, RB refused to confide in her. Catie testified at trial that she then returned to the living room, but her father remained in the bedroom with RB for approximately one hour. When he emerged from the bedroom, the appellant claimed that he had fallen asleep and asked his daughter why she had not awakened him. Finally, Catie recalled that RB was still visibly upset the following morning. Catie testified, "[I]t looked like she was trying not to cry." Also, RB persisted in her refusal to confide in Catie, informing her "that she loved [her] and she didn't want to hurt [her]."

In addition to the appellant's daughter, Dr. Ronald T. Acton, a professor at the University of Alabama in Birmingham, Alabama, testified on behalf of the appellant. Dr. Acton stated that he worked as a professor in the Departments of Microbiology, Epidemiology, and Medicine. He was also the director of the Immunogenetics DNA Diagnostics Laboratory of the University of Alabama Health Services Foundation. With respect to the DNA testing performed by the TBI in this case, Dr. Acton preliminarily observed that a DNA sample containing more than one individual's DNA profile will not yield statistical probabilities concerning the identity of the source of the profiles. Moreover, upon studying "acetate overlays" or charts of the testing performed in Nashville by Special Agent DePriest, he observed that at least one sample tested by DePriest appeared to contain more than one DNA profile. Dr. Acton conceded, "I don't know which [sample] it is."

Dr. Acton further observed that, assuming only one profile was present in a sample, "there are certain population genetic considerations and rules that one has to follow in order to calculate a probability that someone in the population other than the defendant would possess that particular profile." First, one would need to compile random samples of DNA from unrelated individuals for purposes of comparison. Second, in compiling the random samples, one would need to account for "different frequencies of genes that vary by racial groups and var[y] by ethnic groups within a racial group." Accordingly, one would need to separate samples relating to different races. Moreover,

> you would hope that your sample of individuals, in order to establish
> the frequencies of a given set of genes, would be . . . a large enough
> sample that you would sort of take into consideration all the various
> ethnic groups within a race.

Finally, Dr. Acton emphasized that racial and ethnic group distributions vary in different geographic regions of the country. Accordingly, he asserted that one would need to ensure that the compilation of random samples represents the racial and ethnic composition of the population where a particular crime was committed. The doctor concluded that, although he had heard of the Perken-Elmer data base, he had never studied the data base.

In rebuttal of Dr. Acton's testimony, the State recalled Special Agent DePriest to the witness stand. DePriest asserted that the DNA sample obtained from RB's underwear and tested in Nashville did not contain a mixture of DNA profiles. DePriest noted that, during Dr. Acton's testimony concerning the presence of a mixture of DNA profiles in a sample tested by DePriest, Dr. Acton appeared to be examining an "acetate overlay" or chart of

> what is our national control or called the ladder. It is a mixture. It's a known mixture. It's a nationally published mixture. The sample which is the panty cutting that I received from TBI Agent Chad Johnson was not picked up by the defense expert, and that is not a mixture. It's a pure DNA profile of one individual. As my report indicated, I was able to get very good results . . . and the profile does match the Defendant.

At the conclusion of the trial, the jury convicted the appellant of three counts of rape. The trial court conducted a sentencing hearing on February 22, 2000, and imposed concurrent sentences of ten years incarceration in the Tennessee Department of Correction for each conviction. The appellant now challenges his convictions in this appeal.

## II. Analysis

### A.   Evidence of Other Sexual Behavior by the Victim

The appellant first challenges the trial court's exclusion of evidence at the appellant's trial pertaining to other sexual behavior by RB. Although we are reversing the appellant's convictions on other grounds, we will address this issue as it may arise upon retrial of the appellant. With respect to this issue, the record reflects that, on January 24, 2000, two days prior to his scheduled trial date, the appellant filed a "Motion to Offer Specific Instances of Conduct of the Victim" pursuant to Tenn. R. Evid. 412. In his motion, the appellant described testimony that he intended to introduce at his trial concerning numerous occasions on which RB engaged in or discussed engaging in sexual activity with other persons and one occasion on which she testified falsely about another rape. The appellant alleged that "the victim's pattern of past sexual behavior would prove that victim's alleged sexual acts with the accused, if true, were consensual." In explanation of his failure to file the motion within ten days of trial as required by Tenn. R. Evid. 412(d)(1)(i), the appellant asserted that his investigator only discovered the proffered evidence on January 20, 2000.

The trial court conducted a hearing on the appellant's motion on January 26, 2000, the scheduled trial date. At the hearing, the appellant presented the testimony of his investigator, Janet Morris. Morris testified that she was employed by the appellant two weeks prior to the scheduled trial date and had since submitted to defense counsel three separate reports concerning other sexual behavior by RB. She noted that she submitted her final report one week before the filing of the appellant's motion.

On the basis of Morris' testimony, the trial court denied the appellant's motion. Specifically, the trial court found that the motion was not timely because the proffered evidence did

not relate to a newly arisen issue, and defense counsel could have obtained the evidence earlier with the exercise of due diligence. The trial court did, however, allow the appellant to make an offer of proof for purposes of appeal.

The appellant first presented the testimony of the victim, RB. She testified that, following the appellant's offenses, she engaged in sexual relations with several boys who were approximately her own age. Specifically, she admitted engaging in sexual relations with a boy named Russell Parker and another named Tim Bailey. Moreover, while initially denying engaging in sexual relations with a boy named Justin Davis, she later clarified that she did perform oral sex upon Davis. RB further added that, prior to the appellant's offenses, she engaged in sexual relations with her boyfriend, Hunter Jones, who was also approximately her own age. However, she denied having sex with Jones at any time during the week immediately preceding these offenses. Finally, RB confirmed that, during a November 5, 1998 preliminary hearing in the appellant's case, she testified that she was the victim of another rape that occurred on the New Year's Eve preceding the appellant's offenses. RB further confirmed her testimony that, on the New Year's Eve in question, she was with three friends named Lindsey Lubbock, Cheryl Frazier, and Lisa June. She noted, however, that her friends did not witness the rape, nor did she tell her friends about the rape or report the rape to law enforcement authorities. Additionally, she conceded that she did not know the identity of the New Year's Eve rapist and could not recall the location of the rape. Nevertheless, she firmly maintained the truth of her testimony at the preliminary hearing.

In addition to RB's testimony, the appellant presented the testimony of Russell Parker, who confirmed that he had engaged in sexual relations with RB. Specifically, he recalled that, during a single forty- or forty-five-day time period, he had sex with the victim every night. Moreover, a boy named Robert Pruitt testified that, although he had never engaged in sexual relations with RB, he was present when she invited Tim Bailey to have sex with her. Hunter Jones also confirmed that he had engaged in sexual relations with RB. He noted that, during the course of his relationship with RB, they had sex once every two or three weeks. Finally, the appellant presented the testimonies of Lindsey Lubbock, Cheryl Frazier, and Lisa June, all of whom denied being with RB on the New Year's Eve preceding these offenses.

Tenn. R. Evid. 412 is frequently referred to as Tennessee's rape shield law and "limits the admissibility of evidence about the prior sexual behavior of a victim of a sexual offense, and establishes procedures for determining when evidence is admissible." State v. Sheline, 955 S.W.2d 42, 45 (Tenn. 1997). In essence, Tenn. R. Evid. 412 is a rule of relevance, State v. Brown, 29 S.W.3d 427, 431 (Tenn.), cert. denied, 531 U.S. 916, 121 S. Ct. 275 (2000), that rejects the "anachronistic and sexist view[] that a woman who had sexual relations in the past [i]s more likely to have consented to sexual relations with a specific criminal defendant," Sheline, 955 S.W.2d at 44. Simultaneously, the rule acknowledges that under certain circumstances the exclusion of evidence about a victim's sexual behavior may violate a defendant's right of confrontation, his right to present a defense, and, more broadly, his right to a fair trial.

Accordingly, subsection (b) of Tenn. R. Evid. 412 permits the introduction of

reputation or opinion evidence of a victim's sexual behavior only if "admitted in accordance with the procedures in subdivision (d) of this Rule and required by the Tennessee or United States Constitution." Subsection (c) of the rule more extensively provides:

> Specific instances of conduct. - Evidence of specific instances of a victim's sexual behavior is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this Rule, and the evidence is:
>
> (1) Required by the Tennessee or United States Constitution, or
>
> (2) Offered by the defendant on the issue of credibility of the victim, provided the prosecutor or victim has presented evidence as to the victim's sexual behavior, and only to the extent needed to rebut the specific evidence presented by the prosecutor or victim, or
>
> (3) If the sexual behavior was with the accused, on the issue of consent, or
>
> (4) If the sexual behavior was with persons other than the accused,
>
> > (i) to rebut or explain scientific or medical evidence, or
> >
> > (ii) to prove or explain the source of semen, injury, disease, or knowledge of sexual matters, or
> >
> > (iii) to prove consent if the evidence is of a pattern of sexual behavior so distinctive and so closely resembling the accused's version of the alleged encounter with the victim that it tends to prove that the victim consented to the act charged or behaved in such a manner as to lead the defendant reasonably to believe that the victim consented.

If evidence of a victim's sexual behavior satisfies either subsection (b) or subsection (c), Tenn. R. Evid. 412(d)(4) further requires as a prerequisite to admissibility a determination by the court that the probative value of the evidence outweighs its unfair prejudice to the victim.

Again, the appellant argued to the trial court that evidence of RB's sexual behavior was admissible pursuant to Tenn. R. Evid. 412(c)(4)(iii) relating to "a pattern of sexual behavior so distinctive and so closely resembling the accused's version of the alleged encounter with the victim that it tends to prove that the victim consented to the act charged or behaved in such a manner as to lead the defendant reasonably to believe that the victim consented." The admissibility of the evidence rested in the discretion of the trial court. Sheline, 955 S.W.2d at 46. On appeal, this court will only "find an abuse of discretion when it appears that a trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997). In this case, we cannot conclude that the trial court abused its discretion in excluding evidence of RB's sexual behavior as we agree that the tardiness of the appellant's motion precluded admission of the evidence.

Tenn. R. Evid. 412(d) provides in relevant part:

Procedures. - If a person accused of an offense covered by this Rule intends to offer . . . under subdivision (c) specific instances of conduct of the victim, the following procedures apply:

> (1) The person must file a written motion to offer such evidence.

>> (i) The motion shall be filed no later than ten days before the date on which the trial is scheduled to begin, except the court may allow the motion to be made at a later date, including during trial, if the court determines either that the evidence is newly discovered and could not have been obtained earlier through the exercise of due diligence or that the issue to which such evidence relates has newly arisen in the case.

Addressing the procedural requirements of Tenn. R. Evid. 412, this court has observed, "The policies behind the rape shield law require strict compliance with the procedures set forth in Tenn. R. Evid. 412(d). '[P]rior sexual behavior with others by the victim is altogether inadmissible unless there is compliance with Rule 412(d) . . . .'" State v. Benjamin F. Dishman, No. 03C01-9610-CR-00361, 1998 WL 191447, at *15 (Tenn. Crim. App. at Knoxville, April 23, 1998)(alteration in original). Thus, at the outset, "the trial court's exercise of its discretion was limited to determining whether the testimony presented in the offer of proof [related to a newly arisen issue or] was newly discovered evidence or evidence which could not have been discovered beforehand with the exercise of due diligence." Id.

For the purpose of clarification, we note that the appellant does not mount a facial challenge to the constitutionality of Tenn. R. Evid. 412's procedural requirement that a motion to introduce other sexual behavior by the victim of a sexual offense be filed within ten days of trial. Cf., e.g., Michigan v. Lucas, 500 U.S. 145, 111 S. Ct. 1743 (1991). Moreover, he does not claim that the ten-day time limitation is unconstitutional as applied in his case. Rather, the appellant simply asserts that the facts of his case fall within the ambit of one of the exceptions to the ten-day time limitation, namely the exercise of due diligence did not avail defense counsel in obtaining the proffered evidence at an earlier date. He explains that

> [i]t is difficult, if not impossible, to meet the [time limitation] of Rule 412 under the circumstances of this case,
> (1) when the age of the alleged victim is 15 and one does not normally suspect sexual conduct,
> (2) when the sexual acts themselves represent a broad range. . . .
> (3) when writing all the alleged acts about a 15 year old girl as reported through other juveniles requires a careful and meticulous review before the motion may be filed, and
> (4) nondisclosure by the State.

Preliminarily, regardless of whether "one . . . normally expect[s] [other] sexual

conduct" by a fifteen-year-old victim of a sexual offense, such conduct is not so improbable as to relieve defense counsel of his obligation to investigate. Moreover, the record before this court establishes that appellant's counsel was in fact aware of the possibility of other sexual behavior by RB well in advance of trial. Indeed, defense counsel attached to his motion for new trial a preliminary investigation of such behavior that was authorized by his predecessor in this case, Attorney Joe H. Byrd, and completed on June 4, 1999. In light of this preliminary investigation, neither the "broad range" of RB's sexual behavior nor defense counsel's need to carefully and meticulously review allegations of sexual behavior prior to submitting the allegations to the trial court in a Rule 412 motion explain defense counsel's failure to authorize further investigation until two weeks prior to trial. Additionally, like the trial court, we note that the "broad range" of RB's sexual behavior apparently posed no difficulty to Investigator Morris in collecting the disputed evidence. Finally, notwithstanding the appellant's allegation of "nondisclosure by the State," the appellant does not claim in this appeal that the State violated the mandates of either Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), or Tenn. R. Crim. P. 16 by withholding evidence of other sexual behavior by RB.[2] Indeed, the appellant assumes "for the purpose of this argument that the State did not know of the alleged victim's sexual history" and concludes by asking, "If the State did not know, how could the Defendant's attorney know?" The answer to the appellant's question was correctly supplied by the trial court: Defense counsel could have hired Morris more than two weeks prior to trial.

In any event, regardless of the ten-day time limitation of Tenn. R. Evid. 412(d)(1)(i), the evidence proffered by the appellant was largely inadmissible under Tenn. R. Evid. 412(c)(4)(iii) for the purpose of proving a consensual encounter, and the appellant does not claim any other basis, including the United States and Tennessee Constitutions, for the admission of the evidence. Cf., e.g., Sheline, 955 S.W.2d at 47-48.[3] In Sheline, id. at 46, our supreme court emphasized that, in order for evidence of sexual behavior to qualify for admission pursuant to Tenn. R. Evid. 412(c)(4)(iii), "the sexual conduct must be 'so unusual, so outside the normal, that it had distinctive characteristics which make it the complainant's modus operandi.'" Additionally, the court emphasized that, "to have probative value on the issue of consent, the pattern of distinctive sexual conduct must closely resemble the defendant's version of facts." Id. The appellant in this case not only failed to demonstrate any distinctive characteristics of other sexual behavior by RB but also denied engaging in any sexual activity with RB. In other words, even assuming a distinctive pattern of sexual behavior by RB, the appellant proffered no "version of the alleged encounter" with which to compare the behavior.

---

[2] We note that the appellant did assert a Brady claim in his motion for new trial but elected not to pursue the issue in this appeal.

[3] The State conceded at oral argument that the testimony of Hunter Jones concerning his relationship with RB might have been admissible for the purpose of explaining the source of the semen found on RB's underwear. However, the appellant has never asserted Tenn. R. Evid. 412(c)(4)(ii) as a basis for the admission of Jones' testimony.

Finally, as noted earlier, the appellant included in his Tenn. R. Evid. 412 motion evidence purportedly establishing that RB previously testified falsely about being the victim of another rape. Specifically, the appellant asserted, "Lindsey Lubbock, Cheryl Frazier and Lisa June will testify that [RB] lied about a rape which she testified at the preliminary hearing 11/5/98 occurred December 31, 1997 or January 1, 1998 (New Year's Eve)." Again, the testimonies of Lubbock, Frazier, and June disputed RB's assertion that the three girls were with RB on the New Year's Eve in question. Notwithstanding his inclusion of this evidence in his Rule 412 motion, the appellant also asserted that the evidence was "admissible to impeach [RB]. The fact that she was sworn under oath is admissible for the purpose of impeaching where it shows that she - - somebody is not telling the truth." Defense counsel elaborated that the proffered evidence revealed "a prior inconsistent statement that shows dishonesty." He explained that, if RB were on the witness stand,

> I would ask her did she report a rape prior that had not occurred, number one; that if she testified in the preliminary hearing that a rape did occur, that she couldn't say where it was, couldn't say who it was, couldn't say where it was, any of those things, and she went on to name three people who she said was with her, and we have those three people here, and we anticipate that they will say it didn't happen.

The trial court initially agreed that the proffered evidence "could likely come in because it attacks her credibility, from the standpoint that she has testified falsely in the past." However, after hearing the proffered evidence and upon further reflection, the court concluded:

> I think because of the nature of this case, we've still got to rely on 412 to some extent, and for that reason, looking to this situation and what the real issue is as to whether these three individuals were there, not whether or not this happened, I'm going to disallow it at this time. Defense counsel still has in the record what these three would have said, simply they weren't with her on that date, if their memory is correct. That has been some time back. So that offer of proof is also in the record at this time.

In State v. Anthony Lynn Wyrick, No. E1999-02206-CCA-R3-CD, 2001 WL 472849, at *16 (Tenn. Crim. App. at Knoxville, May 4, 2001), this court held that a prior false accusation of rape does "not constitute 'sexual behavior' as contemplated under Rule 412" and is not subject to exclusion under the rape shield law. Notably, however, the trial court in this case essentially found that the appellant failed to establish that RB's former testimony concerning the New Year's Eve rape was false. State v. Stinnett, 958 S.W.2d 329, 330 n.5 (Tenn. 1997); Tenn. R. Evid. 104(b). We cannot say that the evidence preponderates against this finding by the trial court. State v. Edison, 9 S.W.3d 75, 77 (Tenn. 1999); State v. Stamper, 863 S.W.2d 404, 406 (Tenn. 1993). Accordingly, we cannot say that the trial court erred in excluding the proffered evidence under Tenn. R. Evid. 412. Cf., e.g., State v. Terry Allen Dominy, No. 01C01-9512-CC-00404, 1997 WL 284591, at **3-4 (Tenn. Crim. App. at Nashville, May 30, 1997), reversed on other grounds by State v. Dominy, 6 S.W.3d 472 (Tenn. 1999). This issue is without merit.

**B.      Evidence of Prior False Testimony by RB**

   The appellant characterizes as a separate issue his contention that RB's former testimony about the New Year's Eve rape was admissible pursuant to Tenn. R. Evid. 804(b)(1),[4] and the testimonies of Lubbock, Frazier, and June were admissible as prior inconsistent statements pursuant to Tenn. R. Evid. 806 and Tenn. R. Evid. 613. We preliminarily note that the appellant's reliance upon these rules of evidence, a tenuous proposition at best, is undermined by the complete absence from his brief of any accompanying argument. Tenn. Ct. of Crim. App. Rule 10(b); Tenn. R. App. P. 27(a)(7). Moreover, the appellant's argument before the trial court was devoid of any reference to the rules governing the admission of hearsay evidence. Tenn. R. Evid. 103(a)(2); Tenn. R. App. P. 36(a). In any event, our preceding conclusion that the trial court properly applied Tenn. R. Evid. 412 to exclude evidence concerning RB's former testimony entails our rejection of the appellant's contention. Because this issue may arise once again upon retrial, we will address it in more detail.

   Regardless of whether RB's former testimony about the New Year's Eve rape constituted hearsay, the evidence was inadmissible if irrelevant. Tenn. R. Evid. 402. The appellant effectively conceded in the trial court that the former testimony was irrelevant unless RB's report of another rape occurring on New Year's Eve was untruthful. We have already noted the trial court's finding that the "prior inconsistent statements" offered by the appellant failed to establish the untruthfulness of RB's former testimony. Additionally, even assuming that the appellant established the untruthfulness of RB's former testimony, he failed to demonstrate or even argue the admissibility of evidence thereof pursuant to Tenn. R. Evid. 404(b). Tenn. R. Evid. 404(b) prohibits the introduction as substantive evidence of "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity with the character trait" but authorizes the introduction of such evidence "for other purposes." Thus, in <u>Wyrick</u>, No. E1999-02206-CCA-R3-CD, 2001 WL 472849, at *21, we held:

> Like any other prior wrong or act, a victim's prior false accusation of
> a sexual offense must relate to a fact at issue at trial in order to be
> admissible substantively. Otherwise, the relevance of the evidence
> stems from its tendency to show that the victim has a propensity to
> lie, a purpose that directly conflicts with Rule 404(b), Tenn. R. Evid.

The appellant does not contend in this appeal nor did he contend in the trial court that the relevance of the evidence of RB's prior false testimony stemmed from anything other than its tendency to show that RB has a propensity to lie. Conversely, the appellant does not contend in this appeal nor did he explicitly contend in the trial court that he was entitled under Tenn. R. Evid. 608(b) to question RB on cross-examination concerning prior false testimony for the purpose of attacking her credibility as a witness. Significantly, under Tenn. R. Evid. 608(b), "the witness's answers must be taken as given. Other witnesses cannot be called to rebut the first witness's responses." NEIL P. COHEN ET

---

  [4]In his brief, the appellant actually cites "[Tenn. R. Evid.] 803, Prior Former testimony." Because Tenn. R. Evid. 803 does not contain a provision relating to former testimony, we will assume that the appellant intends to rely upon Tenn. R. Evid. 804(b)(1).

AL., TENNESSEE LAW OF EVIDENCE § 608.4, at 350 (Michie ed., 3d ed. 1995).

Moreover, because the appellant did not wish to introduce RB's former testimony for the purpose of proving the truth of the matter asserted therein, the former testimony did not constitute hearsay, and the appellant could not use Tenn. R. Evid. 806 as a vehicle for attacking RB's credibility. Tenn. R. Evid. 801(c). Again, the difficulty with the evidence proffered by the appellant lay not in its hearsay nature but in its lack of relevance.

Finally, the appellant could not bypass the requirements of Tenn. R. Evid. 404(b) and Tenn. R. Evid. 608(b) by relying upon Tenn. R. Evid. 613. Tenn. R. Evid. 613 authorizes the admission of evidence of prior inconsistent statements to impeach the credibility of a witness. See also State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000). However, the rule requires that the prior statement be inconsistent with the witness' *trial* testimony rather than other pre-trial statements or testimony. See, e.g., State v. Michael Brady, No. M1999-02253-CCA-R3-CD, 2001 WL 30220, at *9 (Tenn. Crim. App. at Nashville, January 12, 2001), perm. to appeal denied, (Tenn. 2001); see also Doochin v. U.S. Fidelity & Guar. Co., 854 S.W.2d 109, 114 (Tenn. App. 1993)("Although the rule does not define an inconsistent statement as one inconsistent with a statement offered at trial, we think that is all it can mean."). Also, Rule 613 clearly contemplates the impeachment of a witness' trial testimony by the witness' *own* prior statement, not by a third party's statement. State v. Michael N. Grey, No. M1999-01428-CCA-R3-CD, 2000 WL 1681220, at *3 (Tenn. Crim. App. at Nashville, November 9, 2000); James William Taylor v. State, No. 01C01-9809-CC-00384, 2000 WL 641148, at *7 (Tenn. Crim. App. at Nashville, May 19, 2000), perm. to appeal denied, (Tenn. 2000).

Indeed, even assuming satisfaction of the above requirements, Tennessee courts have long held that "[e]xtrinsic evidence of a prior inconsistent statement of a witness is inadmissible to impeach the statement of a witness on cross-examination as to collateral matters." State v. Mayo, 735 S.W.2d 811, 817 (Tenn. Crim. App. 1987). We acknowledge the observation of one noted authority that "neither Rule 613 nor any other provision in the Tennessee Rules of Evidence indicates whether the collateral fact rule [still] applies." NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 613.5, at 413-414 (Michie ed., 3d ed. 1995). But see State v. Electroplating, Inc., 990 S.W.2d 211, 226 n.17 (Tenn. Crim. App. 1998)(observing in dicta that the collateral evidence rule is applied in conjunction with Tenn. R. Evid. 613). That having been said, the witness' trial testimony must itself satisfy the Tennessee Rules of Evidence, including rules relating to relevance. In other words, Tenn. R. Evid. 613 does not authorize the elicitation of testimony from a witness that is irrelevant to the instant proceeding for the sole purpose of impeaching the testimony with a prior inconsistent statement. Cf. State v. Jones, 15 S.W.3d 880, 892 (Tenn. Crim. App. 1999), perm. to appeal denied, (Tenn. 2000). This issue is without merit.

## C.    DNA Evidence

Anticipating potential discovery issues upon retrial, we next address the appellant's contention that the trial court erred in failing to exclude DNA evidence proffered by the State or, in the alternative, grant the appellant a continuance of the trial date. The appellant filed a motion on

January 24, 2000, to "suppress" any DNA evidence proffered by the State. In support of his motion, the appellant argued that the State had violated Tenn. R. Crim. P. 16 by failing to respond to his requests for information relating to DNA testing conducted by the TBI. The appellant brought the motion to the trial court's attention on January 26, 2000, the day on which his trial was to commence. The prosecutor responded that the appellant's motion was untimely pursuant to Tenn. R. Crim. P. 12(b)(3). Additionally, the prosecutor noted that the appellant had been granted complete access to his file, and Special Agent DePriest had invited the appellant to visit the TBI Crime Laboratory in Nashville and review any materials in the TBI's possession. The prosecutor explained that the TBI extended the invitation to the appellant instead of sending requested materials because

> what [defense counsel] . . . requested would [have] require[d] three
> to four people working months to come up with the information . . .
> , and it's just so cumulative and it's so burdensome, it would require
> them to stop everything that they are doing and respond to that.[5]

As relevant to the appellant's January 24, 2000 motion, the record further reflects that, on October 12, 1999, defense counsel wrote a letter to the prosecutor assigned to the appellant's case requesting information concerning DNA testing conducted by the TBI.[6] On October 15, 1999,

---

[5]At trial, Special Agent DePriest testified that "the amount of information that was requested was more than what would fit into the trunk of a Taurus vehicle. It was a tremendous amount of information."

[6]Specifically, defense counsel requested the following items:
> 1. The names and curriculum vitae of all laboratory technicians, supervisors,
> directors and any other personnel involved in collecting the evidence,
> establishing the test methodology, performing and interpreting the test results,
> preparing the final report, sampling the population and preparing the database of
> gene frequencies that may be used to calculate the probability that anyone else
> could have contributed the evidence reported in this case.
> 2. The name and curriculum vitae of any expert who may be called to testify in
> this case.
> 3. The procedures manual detailing the protocols used to perform the tests
> conducted in this case.
> 4. Provide documentation of any license and/or accreditation that the laboratory
> may hold for using PCR methodologies for analysis of DNA evidence in forensic
> cases.
> 5. Provide documentation for any proficiency testing programs that the
> laboratory participates that covers the genes assessed used in this case.
> 6. Provide the laboratory bench notes generated in this case.
> 7. Provide the PCR raw data submitted to any proficiency testing program and
> the reports received from the proficiency testing agency indicating whether the
> results submitted were correct or incorrect. Include data two years subsequent to
> the time when the tests were performed in this case up until the present time.
> 8. Documentation of the laboratory error rate in forensic DNA testing. This
> should include reports that may have been retracted, errors that were detected by
> the laboratory after a report was submitted or errors that were detected by other

(continued...)

-14-

the prosecutor wrote the following letter to defense counsel:

> This letter is to acknowledge receipt of your letter dated October 12, 1999, and this letter is in reference to you[r] discovery requests. Please be advised that this office has an open file policy concerning discovery and as such you are welcome at any time to come and copy my entire file. Also, I have spoken to the TBI crime lab concerning this matter and informed them that you may be calling for information. Any information concerning the TBI and DNA testing will have to come from them. If you have any difficulty or run into any problems in this endeavor please do not hesitate to call upon me.

In turn, defense counsel responded in a letter dated October 18, 1999, that he did "not feel comfortable" with the prosecutor's open file policy. He further informed the prosecutor that he was, therefore, filing a formal motion for discovery and requesting a formal response by the State. Simultaneously, defense counsel contacted the TBI directly and requested the items originally listed in his October 12, 1999 letter to the prosecutor.

On October 20, 1999, defense counsel filed a motion for discovery, to which the State responded by reiterating its open file policy. Accordingly, on December 3, 1999, the appellant filed a motion to compel discovery. The trial court conducted a hearing on the appellant's motion on December 16, 1999. At the hearing, the appellant principally complained that he had not yet

---

[6](...continued)

persons.

9. The sampling methodology used to estimate the frequency of alleles in the population sampled, that may be used to estimate the probability that anyone else could have contributed the evidence reported in this case.

10. The criteria used to determine the racial and/or ethnic group of the population sampled.

11. The place of birth and current residence (state, county, city) of the subjects sampled to estimate the frequency of alleles used in this case to calculate the probability that anyone else could have contributed the evidence reported in this case.

12. The method used to estimate the allele frequencies in the population detected at each locus assessed in this case.

13. A list of phenotypes and/or genotypes stratified by racial and/or ethnic group of the subjects sampled that were used to estimate allele frequencies and probability that anyone else could have contributed the evidence reported in this case.

14. Studies performed and raw data generated to determine whether the alleles at each locus assessed in this case are in Hardy-Weinberg equilibrium in the population sampled and in the population where the crime was committed.

15. Studies performed and raw data generated to determine if the frequency of alleles used to estimate probability in this case are the same as the frequency of alleles in the population where the crime was committed.

16. Provide good quality photographic copies (not Xerox copies) of the dot blots generated in this case.

received "dot-blots" or charts of preliminary DNA testing performed by Special Agent Chad Johnson at the TBI laboratory in Jackson. In particular, he complained that he had experienced some difficulty determining whether the "dot-blots" were located at the TBI laboratory in Jackson or the TBI laboratory in Nashville. The prosecutor clarified that Special Agent Johnson's final report was included in his file and available to defense counsel, but other items including the "dot-blots" were likely located at the laboratory in Nashville where the TBI was conducting further testing. Additionally, the prosecutor noted that the special agent conducting the testing in Nashville had not yet issued a final report. At the conclusion of the hearing, the trial court granted the appellant's motion. The order granting the appellant's motion provides:

> The Court specifically ordered all dot blots (good quality photographic copies (not xerox copies)) generated in the case (all tests) to be provided Defendant's counsel no later than January 3, 2000.

On January 3, 2000, the State notified defense counsel that photographic copies of the "dot-blots" generated by the DNA testing performed by Special Agent Johnson were available. Additionally, in a letter dated January 3, 2000, the prosecutor communicated to defense counsel:

> I have also talked with the agent in Nashville who has conducted the more precise testing and he has informed me that the testing that he does cannot be photographed. Additionally, Agent Depriest has informed me that he would be willing to allow you to go to Nashville and follow him through his testing of DNA samples.

Special Agent DePriest reiterated the above invitation in a letter dated January 12, 2000, that was addressed to the prosecutor and apparently forwarded to and received by defense counsel by January 14, 2000. In the letter, DePriest stated:

> I have recently received and reviewed the two DNA discovery requests (dated 12/8/99 and 1/11/2000) for laboratory information regarding [the appellant's case]. In [light] of the short time period and vast amount of information requested, I have been authorized to offer the defense the opportunity to visit the TBI crime laboratory to view and discuss all of the requested information. Given the volume of material, this would greatly facilitate efficient use of time by both the state and defense counsel.

The "Official Serology/DNA Report" setting forth the results of Special Agent DePriest's DNA testing was attached to the January 12, 2000 letter. The appellant filed a copy of DePriest's letter and a copy of the "Official Serology/DNA Report" with the trial court on January 18, 2000.

In ruling upon the appellant's January 24, 2000 motion to exclude DNA evidence proffered by the State, the trial court added that, following the hearing on the appellant's motion to compel discovery, the court again met with the parties in chambers to discuss the appellant's discovery of DNA evidence and that, since the meeting in chambers, the court had received no communications from defense counsel indicating any dissatisfaction with the State's provision of discovery. Accordingly, the trial court agreed with the State that the appellant's motion was

untimely under Tenn. R. Crim. P. 12. Moreover, the court found:

> I've got to look to the spirit of Rule 16, and in this case, it's been undisputed that the State has agreed to furnish their experts to defense counsel, to defense experts. They've offered the phone numbers, the location. They've offered the State's laboratory procedures and protocol and everything be furnished, and you go up there at your leisure and discover all that you want to discover, and I take it that'd be much more than could be put on your desk. I think that sometimes discovery can get over burdensome, but they've got around that by furnishing everything to you, by someone appearing on behalf of the Defendant, be it an expert or counsel, or both, or five people, whatever it would take, and that's through Mr. DePriest's cooperation, that being the expert witness. I think the spirit was met under Rule 16.

Initially, Tenn. R. Crim. P. 12(b)(3) does require that "[m]otions to suppress evidence" be filed prior to trial. Courts have interpreted the phrase "prior to trial" to mean that a motion to suppress must be raised "'sometime earlier than "the day of the trial when the jury is waiting in the hall."'" Spicer v. State, 12 S.W.3d 438, 444 n.6 (Tenn. 2000); see also State v. Smith, 701 S.W.2d 216, 217 (Tenn. 1985); State v. Hamilton, 628 S.W.2d 742, 744 (Tenn. Crim. App. 1981). Moreover, "[t]he mere filing of a motion to suppress is not sufficient to raise an issue for the court to decide. The proponent must bring the motion to the attention of the trial judge and obtain a ruling thereon." State v. Marvin K. Ferguson, No. 03C01-9406-CR-00235, 1997 WL 401825, at *2 (Tenn. Crim. App. at Knoxville, July 17, 1997), affirmed by State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999); see also State v. Burtis, 664 S.W.2d 305, 310 (Tenn. Crim. App. 1983). Although defense counsel in this case filed his motion to suppress DNA evidence two days prior to trial, he failed to bring the motion to the attention of the trial court until the morning of trial. Accordingly, if the appellant's motion was subject to Tenn. R. Crim. P. 12(b)(3), the motion was indeed untimely. However, in State v. Cook, 9 S.W.3d 98, 101 (Tenn. 1999), our supreme court recently quoted with approval the following construction of the federal counterpart to Tenn. R. Crim. P. 12(b)(3) by the United States Court of Appeals for the First Circuit:

> At least as used in 12(b), "suppress" has a rather definite and limited meaning . . . . Motions to suppress are described as "objections to evidence on the ground that it was illegally obtained", including "evidence obtained as a result of an illegal search" and "other forms of illegality such as the use of unconstitutional means to obtain a confession." Put generally, then, suppression motions concern the "application of the exclusionary rule of evidence", or matters of "'police conduct not immediately relevant to the question of guilt'"
> . . . .

United States v. Barletta, 644 F.2d 50, 54 (1st Cir. 1981)(citation omitted). As the appellant's motion in this case was grounded in the State's failure to fully comply with the rules of discovery rather than the State's illegal acquisition of the DNA evidence, it is uncertain whether the appellant was required

under Tenn. R. Crim. P. 12(b)(3) to file his motion prior to trial.

That having been said, this court has held that under Tenn. R. Crim. P. 12(b)(4), "[f]ailure to complain of the alleged discovery violation and to seek a remedy as soon as the defense learns of it may be treated as waiver." State v. Quincy L. Henderson, No. 02C01-9706-CR-00227, 1998 WL 242608, at *4 (Tenn. Crim. App. at Jackson, May 12, 1998). As indicated above, the appellant was at least aware by January 14, 2000, twelve days prior to trial, of the alleged discovery violation. Nevertheless, he waited until the day of trial to bring the alleged violation to the trial court's attention. Accordingly, the appellant has waived his complaint.

Notwithstanding waiver, we agree with the trial court that the State did not violate Tenn. R. Crim. P. 16. In State v. Zane Allen Davis, Jr., No. M2000-00737-CCA-R3-CD, 2000 WL 1879518, at **4-5 (Tenn. Crim. App. at Nashville, December 28, 2000), we observed that Tenn. R. Crim. P. 16(a)(1)(C) & (D) authorizes the discovery of both results or reports of scientific tests and documents and tangible objects necessary to determine the accuracy of the tests and test results. Cf. the discussion in United States v. Liquid Sugars, Inc., 158 F.R.D. 466, 469-473 (E.D. Cal. 1994). In this case, the State provided the appellant complete access both to the results of DNA testing conducted by the TBI and to information relating to the accuracy of the tests and test results. The sole dispute was whether defense counsel should be required to visit the TBI laboratory in Nashville in order to obtain the latter information.

This court has previously noted that, generally speaking, Tenn. R. Crim. P. 16 does not obligate the State "to furnish the appellant with information, evidence, or material which is available or accessible to him or which he could obtain by exercising reasonable diligence." State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); see also State v. Gilford E. Williams, No. W1999-01556-CCA-R3-CD, 2001 WL 43176, at *5 (Tenn. Crim. App. at Jackson, January 17, 2001), perm. to appeal denied, (Tenn. 2001). This principle underlies our holdings that, when defense counsel is granted complete access to the State's file, "[t]he State is not obliged to determine whether defense counsel is aware of each and every item in the file. That is the function of defense counsel to whom the file is opened." Henderson, No. 02C01-9706-CR-00227, 1998 WL 242608, at *4; see also State v. David Dotson, No. 45, 1988 WL 74595 at *2 (Tenn. Crim. App. at Knoxville, July 21, 1988).[7] Similarly, we have held that "[s]ome responsibility must be placed upon a defendant, with full knowledge that an expert will testify, to adequately investigate." Williams, No. W1999-01556-CCA-R3-CD, 2001 WL 43176, at *5; see also State v. Chico Lopez Chigano, No. 1333, 1991 WL 188875, at *8 (Tenn. Crim. App. at Knoxville, September 26, 1991); State v. Dan Baron Reid, No. 16, 1986 WL 8297, at *3 (Tenn. Crim. App. at Jackson, July 30, 1986). In short, absent evidence that the State's invitation to defense counsel to visit the TBI laboratory in Nashville was a tactic designed to hinder the appellant's discovery of material evidence or otherwise harass the appellant, it was indeed the responsibility of defense counsel to visit the laboratory and thereby

---

[7]An open file policy does not, however, relieve a prosecutor of his obligation under Tenn. R. Crim. P. 16(c) to notify defense counsel if he "discovers additional evidence or material previously requested or ordered, which is subject to discovery or inspection under [Tenn. R. Crim. P. 16]."

obtain the requested information.

We recognize that the State's invitation to defense counsel to visit the TBI laboratory in Nashville was issued approximately three weeks prior to trial. Conceivably, defense counsel would have faced some difficulty scheduling a visit to the TBI laboratory in Nashville within those three weeks. However, the appellant never requested a continuance of the trial date for the purpose of arranging a visit to the laboratory, nor in fact did the appellant ever request a continuance due to the State's alleged discovery violation. Rather, the appellant asserted in his motion "that the least relief he should receive is the suppression of all state offered DNA evidence." Even assuming that the State violated Tenn. R. Crim. P. 16, a prerequisite to the remedy of exclusion was the appellant's demonstration by a preponderance of the evidence that he was "actually prejudiced by the failure to comply with the discovery [rule] and that the prejudice [could not] be otherwise eradicated." State v. Garland, 617 S.W.2d 176, 185 (Tenn. Crim. App. 1981); see also State v. Danny Jerome Jones, No. 01C01-9307-CR-00233, 1994 WL 369728, at *4 (Tenn. Crim. App. at Nashville, July 14, 1994)(citing, among other authorities, State v. Brown, 836 S.W.2d 530, 548 (Tenn. 1992)). In this regard, "[t]he inquiry is what prejudice has resulted from the discovery violation, not simply the prejudicial effect the evidence, otherwise admissible, has on the issue of a defendant's guilt." Henderson, No. 02C01-9706-CR-00227, 1998 WL 242608, at *5. Suffice it to say that the appellant failed to demonstrate that the State's requirement that defense counsel visit the TBI laboratory in Nashville in order to obtain requested information was so prejudicial as to preclude any remedy other than exclusion. Cf. id. ("This court will not presume prejudice from a mere allegation. Moreover, prejudice arising from a discovery violation will not be found if it is shown that the defense was otherwise aware of the undisclosed evidence.").

Finally, we note that, on appeal, the appellant cites for the first time Brady v. Maryland, 373 U.S. at 83, 83 S. Ct. at 1194, for the proposition that the trial court should have excluded DNA evidence proffered by the State. Although the appellant made a cursory reference to due process in his motion to exclude the DNA evidence, defense counsel's argument before the trial court focused exclusively upon Tenn. R. Crim. P. 16. Moreover, the sole Brady violation alleged in the appellant's motion for new trial related to the State's failure to provide the appellant exculpatory evidence concerning other sexual behavior by the victim. A party may not make an objection based upon a non-constitutional ground at trial, and assert a constitutional ground for the objection post-trial. State v. Adkisson, 899 S.W.2d 626, 635 (Tenn. Crim. App. 1994). Moreover, on the basis of the record before this court, the appellant is not otherwise entitled to relief. Tenn. R. Crim. P. 52(b); Smith, 24 S.W.3d at 282-283. This issue is without merit.

## D.    Evidence of the Appellant's Character

The appellant also claims that the trial court erred in excluding evidence at trial concerning his truthfulness, yet another issue that may resurface upon retrial. As relevant to this issue, the appellant introduced at trial the testimony of his ex-wife, Connie Sue Gary, that she was previously married to the appellant for four years and she "guessed" that the appellant "was always honest with [her]" during that time period. The State objected to Gary's testimony on the basis that the appellant had not yet testified. The appellant responded that the State had introduced into

evidence the appellant's statement to the police, thereby placing the appellant's truthfulness at issue. Following argument by counsel, the trial court concluded:

> I've never understood the law to allow this type testimony, as brief as it was, without the Defendant's testimony coming first. I have no idea whether the defendant is going to testify or not. I don't think it's prior testimony. I believe the objection is good at this point in time. Once the Defendant takes the stand, if you want to offer this proof and other proof, but at this point I'm just going to sustain the objection and ask that it be stricken.

Tenn. R. Evid. 404(a) provides that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity with the character or trait on a particular occasion." Exceptions to this general proscription include evidence admissible pursuant to Tenn. R. Evid. 608. See Tenn. R. Evid. 404(a)(3). Rule 608(a) provides:

> The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) the evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked.

Id. The trial court evidently relied upon Tenn. R. Evid. 608(a) in excluding Gary's testimony. This court will not find error in the trial court's ruling absent an abuse of discretion. State v. McLeod, 937 S.W.2d 867, 871 (Tenn. 1996).

In McKinney v. State, 552 S.W.2d 787, 790 (Tenn. Crim. App. 1977), this court observed, "An accused may not, of course, show evidence of his credibility as a witness by the use of character witnesses unless he first testifies." McKinney, however, was written prior to the adoption of the Tennessee Rules of Evidence. Moreover, the appellant correctly notes that, notwithstanding Rule 608(a)'s unambiguous reference to the "credibility of a witness," this court has since suggested that a defendant's right under the rule to present evidence of his truthful character upon attack by the State "is not contingent upon his relinquishment of his Fifth Amendment privilege." State v. Phipps, 883 S.W.2d 138, 153 (Tenn. Crim. App. 1994). Nevertheless, our conclusion in Phipps constituted dictum, and nothing in Tenn. R. Evid. 608(a) or the Advisory Commission Comments thereto suggests an intent by the drafters to abandon McKinney's limitation upon an accused's use of character evidence for the purpose of bolstering his credibility.[8]

Additionally, we note our agreement with the State that the appellant minimally at best complied with the requirement that he establish a proper foundation for the introduction of

---

[8]Conceivably, the interplay of Tenn. R. Evid. 806 and the appellant's introduction of his own exculpatory statement under Tenn. R. Evid. 106 would avoid Rule 608(a)'s apparent requirement that the appellant be a witness. However, in this case, the appellant's exculpatory statement was introduced by the State and did not constitute hearsay.

opinion testimony concerning his character. State v. Dutton, 896 S.W.2d 114, 118 (Tenn. 1995); see also State v. Sammy Goff, No. W1999-01976-CCA-R3-CD, 2001 WL 91951, at *3 (Tenn. Crim. App. at Jackson, January 31, 2001), perm. to appeal denied, (Tenn. 2001). Gary did not indicate when she and the appellant were married, nor did she indicate the extent of her contact with the appellant since their divorce. As one commentator has observed,

> [s]ince the reputation or opinion evidence is introduced to provide evidence of a witness's character so that the trier of fact can more accurately assess the witness's credibility, the key issue is the witness's character at or near the time of testimony. Accordingly, the reputation or opinion proof under Rule 608(a) should relate to the witness's character at the time of the proceeding.

NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 608.2, at 346 (Michie ed., 3d ed. 1995).

Even assuming that the appellant established a proper foundation, the appellant was not entitled to present Gary's testimony because the State had not yet attacked the appellant's character for truthfulness. In this regard, we note that the United States Court of Appeals for the Ninth Circuit, in interpreting the essentially identical federal counterpart to Tenn. R. Evid. 608(a), carefully distinguished between attacks by the State upon a witness' credibility in the current case and attacks by the State upon the witness' prior history or general character for truthfulness, stating that only the latter triggers rehabilitation under Rule 608(a). United States v. Dring, 930 F.2d 687, 690-692 (9th Cir. 1991). Accordingly, the State's introduction of testimony by other witnesses contradicting the appellant's version of the facts generally does not trigger rehabilitation under Rule 608(a). Id. at 691; see also United States v. Angelini, 678 F.2d 380, 382 n.1 (1st Cir. 1982); United States v. Danehy, 680 F.2d 1311, 1314 (11th Cir. 1982); United States v. Jackson, 588 F.2d 1046, 1055 (5th Cir. 1979); cf. People v. Miller, 890 P.2d 84, 93-96 (Colo. 1995); State v. Rabe, 687 P.2d 554, 561 (Haw. Ct. App. 1984); State v. Ross, 685 A.2d 1234, 1236 (N.H. 1996); Spector v. State, 746 S.W.2d 946, 950-951 (Tex. Ct. App. 1988); State v. Eugenio, 579 N.W.2d 642, 648-649 (Wis. 1998). One commentator explained, "[C]ontradiction evidence might be offered to prove the witness has intentionally lied, but for reasons that are case-specific and have nothing to do with general trustworthiness." 28 CHARLES ALAN WRIGHT & VICTOR JAMES GOLD, FEDERAL PRACTICE AND PROCEDURE § 6116, at 70 (West Publishing Co. ed., 1993). The record before this court reflects that the State did nothing more than offer evidence contradicting the appellant's statement to the police concerning whether or not he raped RB. Certainly, the appellant's motive to lie about those facts was entirely case-specific.

Of course, "[e]vidence barred by Rule 608 may be admissible by another evidence rule." 4 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 608.02(3)(c), at 608-13 (Joseph M. McLaughlin & Matthew Bender & Co. eds., 2d ed. 2001). In contrast to Rule 608(a), Tenn. R. Evid. 404(a)(1) addresses the admissibility of proof of the character of the accused as substantive evidence. Specifically, Rule 404(a)(1) permits the introduction of "[e]vidence of a pertinent character trait offered by the accused or by the prosecution to rebut the same." Under Tenn. R. Evid. 405(a), such "proof may be made by testimony as to reputation or by testimony in the form of an opinion."

Like Rule 608(a), Rule 404(a)(1) is substantially identical to its federal counterpart. Accordingly, we note that the United States Court of Appeals for the Fifth Circuit has opined that "pertinent" is a term synonymous with "relevant," and a defendant's truthfulness is relevant in the following three situations:

> (1) The offense charged is crimen falsi; i.e., a lie by the defendant is an element of the crime. (2) The defendant has testified on his own behalf and his credibility has been attacked. (3) The truth of out-of-court statements made by the defendant has been attacked.

United States v. Hewitt, 634 F.2d 277, 279 (5th Cir. 1981)(citations omitted); see also United States v. Lechoco, 542 F.2d 84, 88 (D.C. Cir. 1976)(holding that, when the State challenged the veracity of a defendant's statements to psychiatrists, on which statements the doctors based their opinions concerning the defendant's mental state at the time of the offense, evidence of the defendant's character for truthfulness "went to the heart of his guilt or innocence" and was admissible substantively). Consistent with Hewitt, this court held in State v. William B. Thurbley, No. 03C01-9709-CC-00414, 1999 WL 301591, at *15 (Tenn. Crim. App. at Knoxville, May 11, 1999), perm. to appeal granted, (Tenn. 1999), that, when evidence of a defendant's character for truthfulness relates to the credibility of a statement that he gave to the police, the evidence is admissible under Tenn. R. Evid. 404(a)(1).

Of course, the issue of whether the appellant established an adequate foundation for Gary's testimony is equally of concern whether determining the admissibility of Gary's testimony under Rule 608(a) or Rule 404(a)(1). Moreover, Gary's testimony that she "guessed" that the appellant was truthful with her during their marriage was hardly a ringing endorsement of his character for truthfulness. Accordingly, the exclusion of the evidence, if error, does not afford an independent basis for the reversal of the appellant's convictions. Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

## E.    Sufficiency of the Evidence

The appellant next challenges the sufficiency of the evidence underlying his convictions of rape. In order to prevail, the appellant must demonstrate to this court that no "rational trier of fact" could have found the essential elements of the offenses beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Tenn. R. App. P. 13(e). In other words, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). All factual issues raised by the evidence, including questions concerning the credibility of witnesses and the weight and value to be given the evidence, are resolved by the trier of fact and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990). These standards apply to convictions based upon direct evidence, circumstantial evidence, or both. State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000), cert. denied, __ U.S. __, 121 S. Ct. 2600 (2001); State v. Vann, 976 S.W.2d 93, 111-112 (Tenn. 1998)(appendix).

Again, the State charged the appellant in this case with three counts of rape, each count relating to a separate act of penetration. State v. Phillips, 924 S.W.2d 662, 665 (Tenn.

1996)("'[A]n accused may be convicted of more than one offense when the rape involves separate acts' of sexual penetration."). With respect to each count, the State was required to prove beyond a reasonable doubt that (1) the appellant engaged in unlawful sexual penetration of RB; (2) the appellant used force to accomplish the act; and (3) the appellant acted intentionally, knowingly, or recklessly. Tenn. Code Ann. § 39-13-503 (1997). The appellant challenges his convictions on the basis that "[t]here is not evidence of force, coercion in this case." We note as a preliminary matter that each count of the indictment in this case charged only rape by force rather than rape by force or coercion. Accordingly, notwithstanding the trial court's instructions to the jury,[9] we will only address whether the evidence established the appellant's use of force to commit the charged rapes. Cf. State v. Fitz, 19 S.W.3d 213, 215 & 217 n.5 (Tenn. 2000).

Our legislature has defined "force" as "compulsion by the use of physical power or violence" and has directed that the term "be broadly construed to accomplish the purposes of this title." Tenn. Code Ann. § 39-11-106(a)(12) (1997). Briefly summarizing the evidence in this case, RB first testified that she was unsuccessfully attempting to push the appellant's hands away from her body when he penetrated her vagina with his finger. Second, the appellant engaged in a struggle with RB to pull her boxer shorts down her legs prior to performing cunnilingus upon her; he held her hands down during cunnilingus; and he persisted in performing cunnilingus despite RB's effort to "smash[] his head with [her] legs." Third, the appellant continued to hold RB's hands down while penetrating her vagina with his penis. According to RB, the appellant's confinement of her hands prevented her from moving. She concluded that, although she did not suffer any bruises as a result of the appellant's offenses, she was "sore" following the offenses. In short, the evidence adduced at trial established the appellant's use of "compulsion by the use of physical power" with respect to each count of the indictment. See, e.g., State v. McKnight, 900 S.W.2d 36, 48 (Tenn. Crim. App. 1994); State v. Arthur Clark, No. W1999-01747-CCA-R3-CD, 2000 WL 1224756, at *3 (Tenn. Crim. App. at Jackson, August 25, 2000), perm. to appeal denied, (Tenn. 2001); cf. State v. Wade Henry Allen Marsh, No. E1998-00057-CCA-R3-CD, 2000 WL 555231, at *2 (Tenn. Crim. App. at Knoxville, May 8, 2000), perm. to appeal denied, (Tenn. 2001). This issue is without merit.

## F.    Lesser-Included Offenses

Finally, the appellant contends that the trial court erred in refusing to instruct the jury on sexual battery as a lesser-included offense of each count of rape. Initially, we note that the appellant failed to object to the trial court's jury instructions. Nevertheless, a trial court's duty to charge a jury as to the law of each offense included in an indictment exists regardless of any request or objection by the appellant. See, e.g., State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999); Tenn. Code Ann. § 40-18-110(a) (1997). Sexual battery is a lesser-included offense of rape under the test enunciated by our supreme court in Burns, 6 S.W.3d at 466-467. See State v. Timothy R. Bowles, No. M1997-00092-SC-R11-CD, 2001 WL 856575, at *4 (Tenn. at Nashville, July 31,

---

[9]We need not consider the effect of the trial court's instruction on coercion as we must reverse the appellant's convictions and remand this case for a new trial due to the court's failure to instruct the jury on sexual battery as a lesser-included offense of each rape charge. At the new trial, however, the trial court should omit any instruction to the jury on coercion.

2001)(publication pending).  Accordingly, with respect to each count of rape, the trial court was obligated to instruct the jury on sexual battery if there existed evidence that reasonable minds could accept as to the lesser-included offense and this evidence was legally sufficient to support a conviction of the lesser-included offense.  Burns, 6 S.W.3d at 469.  In determining whether the evidence warranted an instruction on sexual battery, the court was required to "view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence."  Id.

As relevant to this case, the offense of sexual battery comprises the following essential elements: (1) unlawful sexual contact with the victim by the defendant; (2) force was used to accomplish the act; and (3) the defendant acted intentionally, knowingly, or recklessly.  Tenn. Code Ann. § 39-13-505 (1997).  "'Sexual contact' includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification."  Tenn. Code Ann. § 39-13-501(6) (1997).  In proving the offenses of rape, the State necessarily proved all the essential elements of sexual battery with the exception of the requirement that the sexual contact be for the purpose of sexual arousal or gratification.  Bowles, No. M1997-00092-SC-R11-CD, 2001 WL 856575, at *4.  Because the jury could reasonably have construed the sexual contact in this case to be for the purpose of sexual arousal and gratification, the trial court's failure to instruct the jury on sexual battery was error.  In this regard, we reiterate our supreme court's observation that "[w]hether sufficient evidence supports a conviction of the charged offense does not affect the trial court's duty to instruct on the lesser offense if evidence also supports a finding of guilt on the lesser offense."  Burns, 6 S.W.3d at 472.  Additionally, we cannot conclude beyond a reasonable doubt that the trial court's error was harmless as the jury was not afforded an opportunity to consider an intermediate lesser-included offense.  Bowles, No. M1997-00092-SC-R11-CD, 2001 WL 856575, at *5; State v. Curtis Jason Ely, Nos. E1998-00099-SC-R11-CD & E1999-00170-SC-R11-CD, 2001 WL 605097, at *14 (Tenn. at Knoxville, June 5, 2001)(publication pending).

### III.  Conclusion

For the foregoing reasons, we reverse the appellant's convictions of rape and remand these cases to the trial court for a new trial.

NORMA McGEE OGLE, JUDGE

-24-